UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROHAN HAMILTON,

                Petitioner,

– against –

WILLIAM LEE, Superintendent,

                Respondent.

**Memorandum & Order**

13-CV-4336

**Appearances**

**Rohan Hamilton**

Lawrence Mark Stern

**William Lee**
*Superintendent, Green Haven*
*Correctional Facility*

Kenneth P. Thompson
District Attorney

By: Anthea Hemery Bruffee
Edward John Purce
Rhea Ann Grob
Kings County DA's Office

**J**ACK **B. W**EINSTEIN**, Senior United States District Judge:**

| | | |
|---|---|---|
| **I.** | **Introduction** | 3 |
| **II.** | **Fact and Procedural Background** | 7 |
| | **A.  State Proceedings** | 7 |
| |    **1.  Criminal Case** | 7 |
| |       **a)  Duct Tape Evidence** | 8 |
| |       **b)  Additional Evidence** | 8 |
| |       **c)  Conviction** | 9 |
| |    **2.  Direct Appeal** | 9 |
| |    **3.  Motion to Vacate Conviction** | 11 |
| |    **4.  *Coram Nobis* Application** | 11 |
| | **B.  Federal Proceedings** | 11 |
| |    **1.  *Habeas Corpus* Petition** | 11 |
| |       **a)  Denial of Right to Confront Witnesses** | 11 |
| |       **b)  Introduction of Perjured Testimony** | 13 |
| |       **c)  Introduction of False and Inflammatory Evidence** | 13 |
| |       **d)  Withholding of Brady Material** | 14 |
| |       **e)  Denial of Effective Assistance of Counsel** | 14 |
| |       **f)  Tape Unavailable** | 15 |
| |    **2.  Denial of *Habeas* Petition** | 17 |
| |    **3.  Appeal** | 17 |
| |    **4.  Retrieval and Examination of Tape** | 18 |
| **III.** | **Instant Rule 60(b) Motion** | 18 |
| | **A.  Petitioner's Rule 60(b) Motion** | 18 |
| | **B.  Re-examination of Tape by Petitioner's Expert** | 19 |
| | **C.  Petitioner's Supplemental Letter** | 21 |
| | **D.  Evidentiary Hearing Ordered** | 21 |
| | **E.  Respondent's Opposition** | 22 |
| | **F.  Tape Re-examination Ordered** | 23 |
| | **G.  Additional Reports by Petitioner's Expert** | 23 |
| | **H.  Re-examination of Tape by NYPD** | 24 |
| | **I.  Evidentiary Hearing** | 24 |

**IV.    Applicable Law** ...................................................................................................... 25

   **A.    Rule 60(b) Relief from a Judgment or Order** ................................................ 25

      **1.    Rule 60(b)(1):  Mistake, Inadvertence, Surprise, or Excusable Neglect** ................ 26

      **2.    Rule 60(b)(2):  Newly Discovered Evidence** ................................................ 26

      **3.    Rule 60(b)(6):  Any Other Reason that Justifies Relief** ........................................... 27

   **B.    Rule 60(b) Motion or Successive Habeas Petition** .......................................... 27

   **C.    Ineffective Assistance of Counsel** .................................................................... 28

**V.    Application of Law to Facts** ................................................................................... 30

   **A.    Motion Arises in Part Under Rule 60(b)** ....................................................... 30

      **1.    Claims Relating to Newly Available Tape Evidence Allowed Under Rule 60(b)** ... 30

      **2.    Remaining Claims Dismissed** ....................................................................... 31

   **B.    Motion is Timely** ............................................................................................... 33

   **C.    Motion Fails on Merits** ..................................................................................... 33

      **1.    2005 Tape Examination** .................................................................................. 35

         **a)    Print Development** ............................................................................... 35

         **b)    Print Preservation** ............................................................................... 37

         **c)    Metadata** ............................................................................................... 43

      **2.    No Missing "Photograph;" Digital Camera Used** .......................................... 45

      **3.    Print Image Cards Appropriate For Comparison** ........................................ 49

      **4.    2016 Tape Re-examination** .............................................................................. 51

         **a)    Latent Print Durability** ....................................................................... 51

         **b)    Visible Ridge Detail** ............................................................................ 53

         **c)    Court's Own Observation** ................................................................... 56

         **d)    Uncrumpling** ....................................................................................... 56

      **5.    Petitioner's Admissions** .................................................................................. 58

   **D.    Ineffective Assistance of Counsel** .................................................................... 59

      **1.    Claim Already Considered and Dismissed** ................................................... 59

      **2.    New Evidence Confirms Original Findings** ................................................... 60

   **E.    Adequacy of Rule 60(b) Hearing** ..................................................................... 61

**VI.    Conclusion** .............................................................................................................. 63

# I.    Introduction

This is a Rule 60(b) motion brought by Rohan Hamilton ("petitioner" or "movant") requesting relief from this court's judgment of March 27, 2015, which denied his *habeas corpus* petition.  It is based primarily on his theory that Hurricane Sandy rendered unavailable key palm print evidence which would have proved his innocence.  Sandy washed away many things, but not the evidence of petitioner's guilt.

Evidence of Hamilton's palm prints on duct tape used to tie the victim's ankles together was properly created, manipulated, compared, preserved, and authenticated by a modern digital system instead of traditional photography.  Digital images of petitioner's palm print left on duct tape used to tie up the victim before she was shot, plus testimony, proved defendant guilty.

A digital image, properly produced and preserved, is the equivalent of a photograph.  The use of digital archives is now a common practice across different fields.  *See, e.g.*, Roger S. Bagnall, *Materializing Ancient Documents*, Daedalus (Spring 2016) at 79-81 (discussing the impact of digital databases on the study of ancient written artifacts).

Hamilton was convicted in state court of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree, in causing the death of Shanti Paschal, the mother of their child.  *See* N.Y. Penal L. §§ 125.25(1), 265.03(2).  In January 2007, he was sentenced to twenty-three years to life in prison and a lifetime term of post-release supervision on the murder charge, to run concurrently with fifteen years of imprisonment and five years of post-release supervision on the weapon charge.

The evidence against him included the testimony of his brother, his brother's wife and the victim's mother, as well as his palm print on a piece of duct tape recovered from the victim's body.

An image of the developed latent print was introduced at trial. Petitioner elected to do no independent testing of the tape.

In his *habeas* petition before this court, Hamilton challenged the validity of the tape evidence. *See infra* Part II.B.1. The tape was not then available; it had been stored in a warehouse partially submerged by Hurricane Sandy. The court addressed the merits of petitioner's contentions without the then unavailable duct tape evidence. The petition was denied. The New York Police Department ("NYPD") was reminded of its "continuing obligation to produce the duct tape, and to expedite that production to the extent possible." *Hamilton v. Lee*, 94 F. Supp. 3d 460, 481 (E.D.N.Y. 2015).

The tape subsequently became available for examination. Petitioner's expert, Robert J. Garrett, conducted an inspection, using optical magnification and special light, in August 2015. He did not "observe" a latent palm print on the "crumpled" duct tape specimens recovered from the victim's body. In September 2015, petitioner filed the instant Rule 60(b) motion seeking reconsideration of the court's judgment denying his request for *habeas* relief. *See* Pet'r's Letter Mot. to Alter J., Sept. 29, 2015, ECF No. 92 ("Mot. to Alter J."); Report of Robert J. Garrett, Aug. 27, 2015, Ex. A to Mot. to Alter J., ECF No. 92-1 ("August 2015 Garrett Report").

Because of the unusual circumstances of the case, and in order to develop a complete factual record, the court ruled that petitioner's claims relating to the newly available duct tape evidence were properly raised in the context of a Rule 60(b) motion. An evidentiary hearing was ordered. The parties were directed to appear with qualified experts prepared to address, among other relevant issues: (1) if, and why, the latent print previously identified by the NYPD on the duct tape appeared to no longer be visible; (2) what kind of further examination, if any, could be carried out to determine whether there is, or was, a print on any part of available tape; and (3) any

other issues raised by the parties.  *See Hamilton v. Lee*, No. 13-CV-4336, 2015 WL 6955399, at *1 (E.D.N.Y. Nov. 10, 2015) (ECF No. 102).

Respondent opposed petitioner's Rule 60(b) motion.  *See* Resp't's Letter in Opp'n to Mot. to Alter J., Nov. 23, 2015, ECF No. 105 ("Resp't's Opp'n Letter").  It enclosed a letter from Alynka Jean, the NYPD criminalist who originally developed the latent print from the duct tape in this case.  Jean noted that: (1) future examination of the tape was possible; (2) the area on the tape where the latent print was originally developed was detectable because it was marked with the identifier "AJ#1;" and (3) re-examination might lead to more accurately observing print ridge detail present on the tape.  *See* Letter from Alynka Jean to ADA Edward Purce, Nov. 17, 2015, ECF No. 105 ("Jean Letter").

In light of Jean's observations, and in order to allow the parties to present all possible evidence at a hearing, respondent was ordered to arrange for Jean or another expert to examine the tape to determine whether there is, or was, a print on any part of the available duct tape.  *See* Order of Dec. 14, 2015, ECF No. 109, at 3.

An examination of the duct tape was conducted by respondent's forensic experts in January 2016.  Petitioner's counsel, Laurence Stern, and print expert, Robert Garrett, were also present, together with NYPD personnel.  *See* Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133.

At the heart of the instant Rule 60(b) motion is petitioner's contention that his trial attorney was ineffective because a reasonable doubt could have been raised as to whether his print was on the duct tape.  *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 6:5-8.  Argued is that: (1) the renewed examinations show no print on the tape; and (2) the image of the latent print developed in 2005, which was used to match petitioner's inked print exemplar taken at the time of his arrest, was not

an "original" photograph. Petitioner suggests that because no "original file" was produced, the possibility exists that "there was manipulation or fakery of some sort here." Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 161:1-3.

The parties have had ample opportunity to thoroughly address these issues through evidence, expert testimony, and extensive briefs. Petitioner's contentions are without merit. In the examination made for the Rule 60(b) motion, the NYPD experts were able to observe a "ridge detail" on the part of the tape where a palm print had originally been identified in 2005, marked with the identifier "AJ#1." *See* Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133.

Petitioner's expert initially disputed that such a detail was visible. At the hearing, photographs of the observed ridge detail were introduced by the parties and marked by Jean. *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 30:8-32:7; Resp't's Exs. 20T, 20Q (NYPD Photographs of Re-examined Tape); Pet'r's Exs. 27H, 27G (same). The ridge detail was visible to the court. *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 33:19-20. Although petitioner's expert stated that no "*usable*" print for comparison purposes was discernible on the tape, he conceded that the marked area observed by the court was "*characteristic of ridge detail.*" *Id.* at 32:21, 23, 33:21-23 (emphasis added).

The credible testimony of criminalist Jean established that there is no missing "[p]hantom photograph"—the so-called "original file." *See* Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 161:8-11; *see also id.* at 159:23-160:3. The original file, comprising the enhanced and unenhanced latent print images captured and processed by Jean in 2005 by a digital camera, together with the corresponding metadata, was stored on the NYPD's "More Hits" software, in accordance with appropriate contemporaneous practice. *See* Resp't's Ex. 19 (NYPD Lab Computer Metadata Print-Out); Resp't's Ex. 1 (2005 NYPD Police Lab Standard Operating Procedures); *see also infra* Part

V.C.2. "More Hits" was a forensic image tracking system used by the NYPD in 2005. Its purpose was to digitally store and archive latent print images, as well as keep track of their chain of custody and any changes made.

The latent print images used to make a positive comparison with petitioner's inked print exemplars and introduced at trial were accurate print-outs of the enhanced and unenhanced latent print digital images Jean captured in 2005 and stored through the "More Hits" program. *See* Ct. Exs. 2 and 3 (Original Latent Print Image Cards) (on file with respondent); Pet'r's Ex. 9 (Photocopy of Latent Print Image Cards); Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 175:3-5 (Jean testifying that all the images she took of the developed prints in 2005 are included in Court Exhibits 2 and 3), 202:24-203:8 (Jean testifying that the digital images on Court Exhibits 2 and 3 are her "original photos" and this is what she sent to the NYPD's latent print identification unit at the close of her examination in 2005). There is no original "photograph" in the traditional sense. *See id.* at 159:23-160:3 (Jean confirming that "there is no photograph independent of what we have through material introduced into the computer"); *see also infra* Part V.C.2-3.

## II.      Fact and Procedural Background

### A.      State Proceedings

The factual background is set forth at length in this court's memorandum and order of March 27, 2015. *See Hamilton*, 94 F. Supp. 3d at 466-69. Facts relevant to the instant Rule 60(b) motion are re-stated below.

#### 1.      Criminal Case

Shanti Paschal, mother of petitioner's son, was found dead in her apartment on October 31, 2004. Trial Tr. of Dec. 6-13, 2006, ECF No. 9-12 ("Trial Tr."), at 172:22-174:23. Her hands and feet were bound with duct tape and she was shot several times. *Id.* at 173:25-174:2, 179:14-17.

At trial, Dr. Aglae Charlot, a medical examiner, testified that Paschal died of blood loss from three gunshot wounds to the chest. *See id.* at 79:24-84:4.

### a) Duct Tape Evidence

Duct tape recovered from the victim's body, as well as a roll of duct tape, were among evidence retrieved from the crime scene. *See id.* at 126:20-128:4, 179:11-180:23. Detective Michael Dryver vouchered the ligature pieces of tape. *Id.* at 179:22-25. He sent them to the NYPD's crime lab for further analysis after receiving them from the medical examiner's office. *Id.* at 179:26-180:23.

In January 2005, Alynka Jean, an NYPD criminalist and expert on latent print development, performed several tests on the pieces of tape that had bound Paschal. *Id.* at 149:17-155:6. The first three tests did not yield any prints. The fourth test revealed a single palm print. *See id.* at 163:1-3; *see also infra* Part V.C.1.

At trial, Jean testified that she developed a latent palm print from the duct tape removed from the victim's body, digitally photographed the latent print, pulled the image into the computer program "More Hits" for preservation, digitally enhanced the print image by changing the color to black and white and making it brighter or lighter, and sent a print-out of the palm print image to the latent print section of the NYPD laboratory. Trial Tr. at 150:16-155:17.

Detective Deborah Kennedy, an expert in print analysis and comparison, then compared the latent print image Jean developed from the duct tape with the ink prints taken from petitioner. *See id.* at 200:15-24, 205:19-206:2. She testified that the latent palm print found on the duct tape matched that of the petitioner and explained her methods. *See id.* at 212:10-216:21.

### b) Additional Evidence

Petitioner's brother, Uzal Hamilton, testified that he had overheard petitioner threaten to kill Paschal during a telephone conversation on October 30, 2004, and that petitioner was in

possession of a gun at the time of that argument. *Id*. at 41:3-43:16. He testified that on the night of the murder petitioner confessed to killing Paschal. *See id*. at 32:7-33:22. Uzal Hamilton's wife, Tarkia McGrier, also testified that she overheard petitioner confessing to shooting and killing Paschal on the night of the murder. *Id*. at 52:12-21, 54:24-55:3.

The victim's mother, Bertha Paschal, testified that petitioner called her on the morning of November 1, 2004 and said, "That's why I killed your bitch ass daughter." *See id*. at 92:20-93:26. Bertha Paschal's boyfriend, Reginold Leroy Clark, testified that petitioner telephoned later that morning and threatened him, saying there were many "hiding places" and "dark spots." *See id*. at 98:6-17; *see also Hamilton*, 94 F. Supp. 3d at 467.

### c) Conviction

Petitioner was convicted by a jury of Murder in the Second Degree in violation of New York Penal Law section 125.25(1), and Criminal Possession of a Weapon in the Second Degree, in violation of New York Penal Law section 265.03(2). In January 2007, the state court sentenced him to twenty-three years to life in prison and a lifetime term of post-release supervision on the murder charge, to run concurrently with fifteen years of imprisonment and five years of post-release supervision on the weapon charge. Both terms were to run consecutively with a two-and-one-half year to five year sentence that he was serving for an unrelated offense. *See* Sentence Tr. Jan. 11, 2007, ECF No. 9-12, at 16:16-17:10.

### 2. Direct Appeal

Petitioner, represented by counsel, directly appealed his state court conviction on May 30, 2008. *See* Br. for Def.-Appellant, May 2008, ECF No. 9-1. Argued was that: (1) his Sixth Amendment right to confront the witnesses against him was violated when fingerprint and palm print cards were admitted through testimony of a print examiner, rather than by the testimony of

the officer who took the prints; and (2) that he was deprived of a fair trial when, over objection, the court admitted autopsy photographs that were so morbid, inflammatory, and cumulative of other evidence that their prejudicial effect overwhelmed any ostensible ground for their admission. *Id*. at 14-25; *see also Hamilton*, 94 F. Supp. 3d at 467.

Hamilton then filed a separate supplemental brief *pro se*, which included three additional claims for relief: (1) that he was denied a fair trial in violation of his rights under the Due Process Clause because the evidence adduced at trial was false, and known by the prosecutor prior to trial to be false; (2) that he was denied effective assistance of trial counsel; and (3) that he was denied a fair trial due to judicial misconduct because the judge expressed his opinion during *voir dire* and allowed the admission of false evidence. *See* Suppl. Br., ECF No. 9-3; *see also Hamilton*, 94 F. Supp. 3d at 467-68.

The Appellate Division affirmed. *See People v. Hamilton*, 66 A.D.3d 921, 922 (2d Dep't 2009). It found that because Hamilton did not object to the admission of the print cards on Sixth Amendment grounds at trial, the claim was unpreserved for appellate review and, in any event, without merit. *Id*. at 921-22 (finding that the cards themselves were not directly accusatory and were properly admitted into evidence through the testimony of the print examiner, who was available for cross-examination). The court also determined that the photographs of the deceased's body had been properly admitted into evidence. *Id*. at 922 ("the photographs were relevant both to help illustrate and corroborate the testimony of the medi[c]al examiner, and to establish intent"). It dismissed Hamilton's remaining contentions as unpreserved for appellate review and without merit. *Id*.

In December 2009, the Court of Appeals of New York denied an application for leave to appeal. *See People v. Hamilton*, 13 N.Y.3d 907 (2009).

### 3.     Motion to Vacate Conviction

Petitioner subsequently filed a *pro se* motion to vacate his conviction with the New York State Supreme Court, Kings County.  His motion was denied.  *See Hamilton*, 94 F. Supp. 3d at 468-69.

### 4.     *Coram Nobis* Application

He filed a motion for a writ of error *coram nobis*, claiming that his appellate counsel provided ineffective representation on his direct appeal by refusing to raise claims petitioner presented to her, including the ineffective assistance of his trial counsel.  *See* Not. of Mot. for Writ of Error *Coram Nobis*, July 31, 2012, ECF No. 9-9.  In March 2013, the Appellate Division denied petitioner's motion.  *People v. Hamilton*, 104 A.D.3d 874 (2d Dep't 2013).  In June 2013, the Court of Appeals of New York denied an application for leave to appeal.  *See People v. Hamilton*, 21 N.Y.3d 1004 (2013).

## B.     Federal Proceedings

### 1.     *Habeas Corpus* Petition

In July 2013, petitioner filed a petition for a writ of *habeas corpus* in this court.  He sought relief on the five grounds listed below.  Pet. for Writ of *Habeas Corpus*, July 22, 2013, ECF No. 1; Suppl. Mem. of Counsel in Supp. of Pet. for *Habeas Corpus*, Mar. 11, 2014, ECF No. 15 ("Pet'r's Suppl. Mem."); Pet'r's Reply to Resp't's Resp. to Pet'r's Suppl. Mem. of Law, May 12, 2014, ECF No. 20; *Hamilton*, 94 F. Supp. 3d at 469.  Counsel was appointed.  *See* Order of Aug. 22, 2013, ECF No. 5.

#### a) Denial of Right to Confront Witnesses

*First*, petitioner claimed that he was denied his rights under the Confrontation Clause when palm print photographs and out-of-court statements identifying them as his were introduced at trial

for the purpose of proving his guilt. *Hamilton*, 94 F. Supp. 3d at 472. Petitioner argued that, while an NYPD detective testified that she positively compared an image of the latent print developed from the duct tape with a photograph of an inked print taken from petitioner, the witness did not possess independent knowledge of the sources or the identities of the images. Pet'r's Suppl. Mem. at 3. Rather, she read the labels from reports accompanying the data in order to establish their provenance. *Id*. Petitioner contended that only computer print-outs of the latent and inked prints were produced at trial; the originals were not produced and no evidence was introduced that the print-outs were accurate copies of the originals. *Id*. at 5 ("There was no nonhearsay evidence of how or when or by whom the original photograph of the inked print was input into the system, nor evidence that the copy of the inked print produced at trial was an accurate copy . . . ."). Petitioner's claim focused on an alleged lack of foundation:

> [P]etitioner was deprived of the Constitutional rights to cross-examination, due process, and fair trial by the introduction of the hearsay, and apparently false, testimony that the inked exemplar print was taken from petitioner. The label or report read by the crime lab witness attributing the inked print to petitioner was not prepared by the witness and was not based on her personal knowledge, and was apparently false. There was no evidence that the photographs of the prints used in the comparison were true and accurate copies of the original prints.

*Id*. at 7.

This court found that petitioner's claims were barred because of a state court default. And, even if this were not the case, the Appellate Division had reasonably determined that the claims were without merit. *Hamilton*, 94 F. Supp. 3d at 472-73. The prints and the notation on the inked print card were not directly accusatory and not "testimonial" under the Confrontation Clause, since "[t]hey were made primarily to identify defendant in order to process his arrest, not to create evidence for trial:"

> There is a strong inference that an officer assigned in a murder case to take fingerprints of a suspect clearly linked to the crime would take the prints in a professional, correct way. Raising this point on trial would, with a high degree of probability, not have aided the defendant. . . . Defendant had the opportunity to cross-examine Jean, who lifted the latent print; Kennedy, who made the accusatory match; and Dryver, whose name was noted on the ink fingerprint card. Defendant's confrontation right was not violated in substance by Kennedy's testimony, including that regarding the notations on the fingerprint card.

*Id.* (internal citations omitted).

### b) Introduction of Perjured Testimony

*Second*, petitioner argued that he was denied his constitutional rights to due process, equal protection and a fair trial by the introduction of: (1) Detective Kennedy's allegedly false testimony that the inked exemplar was taken by Detective Dryver; and (2) computer print-outs of "photographs" of prints rather than original prints or original "photographs" of prints. *Id.* at 473-74.

With respect to (1), this court determined that petitioner's claims were unsupported and speculative. *Id.* at 474. With respect to (2), this court found that the claim was based primarily on a lack of foundational evidence. The court concluded that "[t]he alleged lack of foundation for the admission of the computer printouts and the information on the ink prints' label raises state evidentiary matters that are not cognizable on *habeas* review" and, in any event, represented "routine matters not likely to have been made improperly." *Id.* at 474 (internal citations omitted).

### c) Introduction of False and Inflammatory Evidence

*Third*, petitioner argued that he was deprived of his constitutional rights to due process and a fair trial by the introduction of: (1) allegedly misleading testimony that Detective Dryver unsuccessfully followed petitioner's cell phone signals out of state when searching for him; and (2) purportedly inflammatory photographs. *Id.* at 475.

This court determined that the challenge to the detective's testimony was procedurally barred and without merit. *Id.* With respect to the photographs, the Appellate Division had considered and rejected the challenge. This court found that the Appellate Division's decision was not unreasonable given the fact that the evidence was accompanied by an appropriate instruction to the jury. *Id.*

### d) Withholding of *Brady* Material

*Fourth*, petitioner argued that the prosecution denied him his due process rights by withholding crucial *Brady* material—an "original photograph" of the latent palm print purportedly taken by Jean, an earlier laboratory report, and a police report. *See id.* at 476; *see also* Pet'r's Suppl. Mem. at 21-22.

In the context of petitioner's motion to vacate his conviction, the New York Supreme Court rejected petitioner's claims relating to the withholding of a latent print "photograph" and an earlier laboratory report, since petitioner had offered no corroboration that such documents existed or that, even if they did exist "not only would [they] be favorable to his case, but [they] would have changed the outcome of the trial." *Id.* at 476 (quoting *New York v. Hamilton*, No. 327/2005 (N.Y. Sup. Ct. July 13, 2011) (Decision & Order), at 4-5 (filed in the instant case at ECF No. 9-6)). This court agreed: the New York Supreme Court's "adjudication of these claims was not contrary to, or an unreasonable application of, [United States] Supreme Court precedent or an unreasonable determination of the facts." *Id.*

With respect to the allegedly missing police report, the claim was unexhausted and, in any event, without merit. *See id.* at 476-77.

### e) Denial of Effective Assistance of Counsel

*Fifth*, petitioner claimed that his trial counsel was ineffective by failing to: (1) seek sanctions for alleged *Brady* violations; (2) conduct a pre-trial investigation; (3) object to the

prosecution's opening statement; (4) retain an independent fingerprint expert or request fingerprint reports; (5) appropriately cross-examine prosecution witnesses; and (6) avoid implicating him in the charged crime during summation. Petitioner had raised virtually identical claims in his *pro se* supplemental brief on direct appeal. *Id*. at 478.

This court found that the Appellate Division had reasonably concluded that such claims did not rise to the level of a Sixth Amendment violation. *Id*. In particular, petitioner failed to show that his trial counsel was ineffective for not requesting sanctions for alleged *Brady* violations, because no *Brady* violations were established: "[p]etitioner has failed to demonstrate that the prosecution intentionally withheld an exculpatory photograph of the latent fingerprint Criminalist Jean purportedly made during her examination, an earlier laboratory report, or a police report." *Id*. Petitioner did not demonstrate that his trial counsel was ineffective by failing to pursue expert analysis to refute the palm print testimony: "trial counsel adequately challenged the prosecution's fingerprint expert on cross-examination and in his summation. . . ." *Id*. at 479.

Petitioner also claimed that his appellate counsel was ineffective in failing to advance most of his present claims relating to his trial counsel's ineffective assistance. This claim was meritless since appellate counsel had exercised sound, reasonable and professional judgment in deciding not to raise an ineffective assistance of trial counsel claim. *Id*. at 479-80 ("She explained that it made no sense to attack petitioner's trial attorney for failing to pursue arguments that she herself had correctly concluded would not entitle petitioner to relief as a matter of law.") (internal citations omitted).

### f) Tape Unavailable

Petitioner sought to retrieve the duct tape with which the deceased victim was bound to demonstrate, through expert examination, that his palm print was not, and had never been, on the tape. Trial counsel was ineffective, according to petitioner, because he did not arrange to conduct

an independent examination. Such an examination, petitioner alleges, would have shown that there had never been his print on the duct tape. *See id*. at 480.

At the time of the *habeas* petition, the NYPD demonstrated that the tape was not available due to damage caused to the Erie Basin Evidence Facility in Red Hook, Brooklyn, by Hurricane Sandy. The court found that "[c]ounsel for defendant did not fall below minimum standards in not seeking out independent expert examination since, under the circumstances, the project had little likelihood of success." *Id*. at 480.

The issue of the tape and possible fabrication were considered at the hearing on the *habeas* petition. Petitioner's expert conceded that there was a match between the image of the latent palm print developed from the tape and that of Hamilton's inked print exemplars. *See* Hr'g Tr., Mar. 20, 2015, ECF No. 75, at 25:7-8. His claim therefore rested on allegations that the evidence was fabricated. *See id*. at 27:18-22 ("THE COURT: . . . There is a possibility here based on the material I have before me and the concession that the photographs actually presented show a match, so that the claim must rest on evidence that was fabricated, correct? MS. BRUFFEE: Yes."). It was concluded that there was no evidence suggesting that the inked and latent prints—as shown on the print image cards introduced at trial—might have been a fabrication or mistake. *Id*. at 27:23-28:2 ("THE COURT: That's the claim with no basis at all because we now have a concession that there is a match with the photographs which appear to me and would appear to the average counsel with minimum skills sufficient to meet constitutional requirements to be clear enough."). The court determined that the absence of the duct tape from the record did "not support granting the petition." *Hamilton*, 94 F. Supp. 3d at 481.

The court did, however, issue a certificate of appealability with respect to (1) petitioner's right to confrontation, and (2) "whether defense counsel provided a constitutionally adequate

defense with respect to the issue of the duct tape, and whether a different defense would have changed the verdict." *Id.* The NYPD was determined to be under a "continuing obligation to produce the duct tape, and to expedite that production to the extent possible." *Id.*

### 2. Denial of *Habeas* Petition

The *habeas* petition was denied orally. *See* Hr'g Tr., Mar. 20, 2015, ECF No. 75, at 29:15-16. Petitioner then filed a motion for reconsideration. *See* Pet'r's Mot. for Reconsideration, Mar. 21, 2015, ECF No. 67. The court issued a memorandum and order on March 27, 2015 explaining the reasons for its denial of the *habeas* petition. *Hamilton*, 94 F. Supp. 3d at 460. On the same day, it also issued a judgment in which it:

- denied petitioner's motion for reconsideration, since no new substantial grounds were asserted;

- granted a certificate of appealability with respect to: (1) petitioner's right to confrontation; and (2) whether defense counsel provided a constitutionally adequate defense with respect to the issue of the duct tape, and whether a different defense would have changed the verdict; and

- determined that the NYPD "is under a continuing obligation to produce the duct tape, and to expedite that production to the extent possible." The court referred this issue to the magistrate judge for decision, noting that the "referral is not intended by the court to affect the finality of this judgment of dismissal and certification."

Judgment, Mar. 27, 2015, ECF No. 73.

After dismissing petitioner's habeas petition orally on the record, the court declared that it would "hear a Rule 60 motion based on any additional material . . . found but the order of dismissal is a final judgment." Hr'g Tr., Mar. 20, 2015, ECF No. 75, at 30:2-4.

### 3. Appeal

Petitioner appealed this court's denial of his *habeas* petition to the Court of Appeals for the Second Circuit. *See* Not. of Appeal, Apr. 13, 2015, ECF No. 76. That appeal is currently pending.

### 4.      Retrieval and Examination of Tape

The duct tape evidence became available shortly after the conclusion of the *habeas* proceedings.  The NYPD agreed "under the unique circumstances of this case and subject to the drafting and signing of appropriate waivers," to allow defendant's fingerprint expert to conduct "on-site testing of the ligature duct tape removed from the homicide victim's body . . . ."  Resp't's Letter of Apr. 20, 2015, ECF No. 78, at 1.

## III.    Instant Rule 60(b) Motion

### A.      Petitioner's Rule 60(b) Motion

Petitioner obtained access to, and examined, the piece of duct tape on which petitioner's latent palm print was allegedly found, as well as two other pieces of tape removed from the body of the victim.  He then moved for relief from this court's March 27 judgment, relying on Federal Rules of Civil Procedure 60(b)(1), (2) and (6).  *See* Mot. to Alter J.

He is entitled to relief, he argues, because: (1) his expert examined the tape and observed no latent palm print; (2) the "crumpling" of the duct tape was done "purposely prior to trial" in an "attempt to impede its examination and to conceal that the tape was exculpatory;" and (3) no "original photograph" of the alleged latent print was produced; yet an "unidentified, unauthenticated computer print-out of a latent was improperly introduced at trial" and "[t]here was . . . no legitimate evidence that the latent introduced at trial came from the duct tape found on the victim."  *Id.* at 1-2.  According to petitioner:

> Ineffective assistance of defense counsel at trial allowed the testimony that petitioner's latent print was found on the duct tape to go to the jury *without the facts that the testimony was contradicted by the tape itself and impeached by the absence of a photograph necessary to identification of the latent, by the police mishandling of the tape and the photograph indicating purposeful concealment of exculpatory evidence, and by fraud in its creation*.  The mishandling was a trial defense in itself, and to the extent that the

evidence had been damaged or destroyed, it is grounds for vacatur
of the conviction.

*Id.* at 2 (internal citations omitted) (emphasis added).

With its letter, petitioner included a report by its fingerprint expert, Robert J. Garrett, detailing his August 20, 2015 examination of the tape. *See* August 2015 Garrett Report.

## B.      Re-examination of Tape by Petitioner's Expert

Pursuant to the agreement reached by the parties with the NYPD, petitioner's expert examined the duct tape at the NYPD's Erie Basin Evidence Facility. He photographed an unpackaged roll of duct tape, which "appeared to have been damaged by moisture." *Id.* at 2. He also examined three sections of duct tape that were "individually packaged" and "referred to as ligatures" by the NYPD. *Id.* Observed was that the

> [p]ackaging was in dry, brown paper bags which had been sealed
> with evidence and packing tape. The bags seemed undamaged. The
> labeling on the bags was clearly readable. Two cardboard barrels,
> from which the evidence had presumably been retrieved, were near
> the table. They were dry and dented and had what appeared to be
> water stains on the bottom exteriors.

*Id.* at 2.

Garrett found that all three pieces of "ligature" tape were in a "crumpled" condition, which was "detrimental to the preservation of developed fingerprints and to future examination." *Id.* He examined the crumpled pieces under optical magnification and special light, without 'uncrumpling' them. *Id.* His observations were as follows: (1) "[n]o fingerprint ridge detail was observed;" (2) all three pieces of tape appeared to have been "processed in a manner that was consistent with the testimony and lab notes of NYPD Criminalist Alynka Jean: cyanoacrylate (CA) fuming followed by dye staining with Ardox;" (3) "[t]here was no observable indication that a partial palm print was developed" on any of the three segments; (4) "[p]rints developed with CA fuming would not fade over time or due to exposure to moisture;" and (5) generally, if a "portion

of a specimen is found to have something of significant evidential value"—such as a latent print—

"that portion is separated" from the rest of the specimen, but no such excised portion was present

here and no markings on the tape were observed "indicating that a developed print had been

removed and preserved." *Id*. at 2-3.

The expert explained his examination at the evidentiary hearing:

> Q.     And how did you conduct your exam?
>
> A.     I used a small alternate light source that is used to fluoresce the Ardrox stain on the tape, looking for areas on the tape where I would find fluorescence and hopefully also find the fluorescent fingerprint. I also initially examined it using regular white light and optical magnification.
>
> Q.     And did you find a latent print on the tape?
>
> A.     No, sir.
>
> Q.     When you used your light, did things on the tape fluoresce?
>
> A.     There were some areas on the tape that did fluoresce, yes.
>
> Q.     And could you tell whether -- did any of those taped -- any of those fluorescing particles or debris or whatever it was, did that indicate -- did that look in any way like fingerprint, like a fingerprint?
>
> A.     No, sir.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 19:6-22.  He concluded that:

> Any further examination of the duct tape would need to be conducted in a laboratory or other place conducive to further processing.  Only under such conditions would it be feasible to attempt to "uncrumple" the tape and try to locate any developed latent prints which could then be compared to the defendant's exemplar.  Such an examination could possibly determine whether any print was developed on the tape near the torn ends or elsewhere on the roll and the probable event which led to its deposit e.g. it may be possible to determine if it was likely that a print was deposited through casual handling of the roll prior to its use related to the homicide.

August 2015 Garrett Report at 3.

### C.    Petitioner's Supplemental Letter

Petitioner filed a supplemental letter addressing the condition of the duct tape in the warehouse.  *See* Suppl. Rule 60 Mot. Letter, Oct. 8, 2015, ECF No. 98.  It included a supplemental report by Garrett, stating that: (1) with the exception of the duct tape roll, the tape specimens did not appear to have been damaged by water; and (2) any prints developed by Jean using the cyanoacrylate fuming process "would not have been affected or dissolved by exposure to moisture or immersion in water."  Suppl. Report of Robert J. Garrett, Oct. 7, 2015, ECF No. 98-1.

### D.    Evidentiary Hearing Ordered

Petitioner's motion and accompanying expert report suggested fraud.  In light of the "unusual circumstances of this case and the desirability of developing a complete factual record for the Court of Appeals for the Second Circuit" it was determined that "petitioner's claims relating to the newly available duct tape evidence [were] properly raised in the context of a Rule 60(b) motion challenging the dismissal of the *habeas corpus* petition."  *Hamilton*, 2015 WL 6955399, at *1.

The parties were directed to appear with qualified experts to address:

> (1) why the latent print previously identified by the NYPD on the duct tape appears to no longer be visible; (2) what kind of further examination, if any, could be carried out to determine whether there is, or was, a print on any part of available duct tape; and (3) any other issues raised by the parties.

*Id*.  As explained in the court's memorandum and order:

> This is a criminal case affected by Hurricane Sandy. Petitioner's Rule 60(b) motion raises serious evidentiary questions requiring further expert analysis. The court is troubled by the results of a recent examination conducted by petitioner's expert, which concluded that no latent palm print was present on apparently critical evidence—the duct tape recovered from the victim's body. *Although evidentiary hearings are disfavored in* habeas *petitions, the unusual circumstances of this case warrant expert testimony* on newly available evidence.

*Id.* (emphasis added).

### E. Respondent's Opposition

Respondent opposed petitioner's motion. *See* Resp't's Opp'n Letter. It submitted a report from Alynka Jean, the NYPD criminalist who originally developed the latent print from the tape in this case. *See* Jean Letter.

According to respondent, Garrett's report and photographs indicate that a palm print was developed on the piece of tape marked as "9B (Ankle);" this piece of tape showed a bracket with the notation "AJ#1" written above it, indicating the location of the print. *See* Resp't's Opp'n Letter at 2; Jean Letter at 1. Out of the three items submitted for evidence, Jean explained, "there was only one developed latent [palm]print that was deemed potentially of value. It was found on item #1 of Property Clerk Invoice # L275795, Court Exhibit Reference 9B, labeled as AJ#1." Jean Letter at 1.

Jean noted that "cyanoacrylate fuming could fade and/or disappear . . . over time due to high heat and friction." *Id.* at 2. In any event, the latent was developed with Ardrox dye stain, which "*does* fade over time regardless of heat, friction or exposure to moisture." *Id.* (emphasis added). Thus, respondent argued, "the fact that the latent print developed from the duct tape was not visible to Mr. Garrett more than ten years after it was developed by Criminalist Jean does not cast doubt on the validity of the latent print evidence in this case." Resp't's Opp'n Letter at 2. Jean noted that "the duct tape is not crumpled in a manner that would prevent future examination" and re-application and re-examination of Ardrox may lead to more accurately observing any finger or palm print ridge detail present on the tape. Jean Letter at 1.

Jean, respondent claimed, properly preserved the developed latent print by making a digital record of it. Resp't's Opp'n Letter at 2. "Taking a photograph leaves the area of ridge detail intact on the evidence rather than using lifting tape to remove it from the surface. This makes future

examination possible." Jean Letter at 1. The NYPD expert explained that "[t]he evidence was examined and packaged within the guidelines of the Standard Operating Procedures of the Police Laboratory in 2005." *Id*. at 2. It was not standard procedure to excise areas of developed latent prints for preservation. Instead, the developed latent prints were preserved "by taking a photograph, leaving it intact on the evidence with a bracket around it and a unique identifier." *Id*.

### F. Tape Re-examination Ordered

In order to "present all possible evidence at the evidentiary hearing" respondent was directed "to arrange for its expert Alynka Jean or another expert to examine the tape to determine whether there is, or was, a print on any part of available duct tape." Order of Dec. 14, 2015, ECF No. 109, at 3. The examination was to be conducted prior to the evidentiary hearing and, if practicable, in the presence of petitioner's expert and counsel. Respondent was ordered to prepare and file a written report. *See id*.

### G. Additional Reports by Petitioner's Expert

Petitioner's expert submitted two additional reports, on January 7, 2016 and January 16, 2016. In his January 7 report, Garrett addressed the durability of cyanoacrylate-developed fingerprints. *See* Suppl. Report of Robert J. Garret, Dec. 20, 2015, ECF No. 121-1. At the request of defense counsel the expert "performed a series of tests on fingerprints that had been deposited on the non-adhesive side of duct tape and developed with the cyanoacrylate (CA) process" in order to "test the durability of the developed prints under various conditions." *Id*. at 1. These included repeatedly brushing developed prints with "a small coarse bristled paint brush," exposing them to heat and running them through a dish washer cycle. *Id*. at 1-2.

The January 16 report concerned the "[d]urability testing of cyanoacrylate developed fingerprints with Ardrox dye stain." *See* Suppl. Report of Robert J. Garret, Jan. 16, 2016, ECF

No. 130.  Garrett conducted tests "on fingerprints that had been deposited on the non-adhesive side of duct tape and developed with the cyanoacrylate (CA) process and dye stained with Ardrox" in order to "test the durability of the developed prints under conditions of high temperature, excessive moisture and friction associated with water under pressure."  *Id*. at 1.  The expert: (1) processed a piece of duct tape through cyanoacrylate ester fumes exposure for forty minutes; (2) ran the section of the tape on which fingerprints had been developed through a dish washer cycle for 60 minutes at a temperature of 117 degrees Fahrenheit without using detergent; (3) allowed the tape to dry; and (4) further examined the print.  *Id*.  The expert reported that following this procedure the prints developed with cyanoacrylate continued to be visible.  *Id*.

## H.    Re-examination of Tape by NYPD

A re-examination of the ligature tape at issue in the present case was conducted by NYPD criminalists Alynka Jean and Manishi Agarwal on January 26, 2016 at the NYPD Property Clerk Erie Basin Auto Pound.  *See* Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133. Assistant District Attorney Edward Purce, petitioner's counsel Lawrence Mark Stern, petitioner's expert Robert Garrett, and police personnel were present.  *Id*.

Out of the three pieces of ligature tape in evidence, the NYPD criminalists re-examined the one recovered from the victim's ankle (item no. 9B).  Only the part marked as "AJ#1" was processed.  Following a series of tests, including re-application of Ardrox stain, a print ridge detail was observed by respondent's experts and photographed.  *Id*.; *see also infra* Part V.C.4.

## I.    Evidentiary Hearing

The parties engaged in extensive further discovery, after which a full evidentiary hearing was conducted.  *See* Hr'g Tr, Apr. 7, 2016, ECF No. 162; Hr'g Tr., Apr. 8, 2016, ECF No. 171. The central issue addressed by the parties, as stated by petitioner's counsel, was whether "evidence

could have been presented on behalf of the petitioner at trial that there was reasonable doubt that the latent [palm] print evidence presented to the jury was valid." Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 6:2-8.

Petitioner presented two expert witnesses: (1) Robert Garrett, the fingerprint expert who conducted an examination of the tape in August 2015; and (2) Richard McEvoy, a forensic photographer, who addressed the availability of an "original camera file" linked to the 2005 "photographs" of the developed latent prints.

Alynka Jean testified for respondent. Respondent also sought to introduce the testimony of former assistant district attorney Elisa Paisner. Objection to her as a witness was sustained. Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 212:13-25.

Following comprehensive witness and expert testimony and full briefing and argument, petitioner's Rule 60(b) motion is denied. Nothing at the hearing puts into question the court's decision of March 27, 2015 denying petitioner's writ of *habeas corpus*.

## IV.    Applicable Law

### A.    Rule 60(b) Relief from a Judgment or Order

Petitioner brings the present motion pursuant to Federal Rules of Civil Procedure 60(b)(1), 60(b)(2) and 60(b)(6), which provide as follows:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > . . .

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(1)-(2), (6).

When considering a Rule 60(b) motion, a court must seek "a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986); *see also Lifrieri v. Stinson*, No. 97-CV-6868, 2009 WL 2413400, at *5 (E.D.N.Y. July 31, 2009); *Clark v. Kuhlman*, No. 98-CV-6086, 2009 WL 87507, at *3 (E.D.N.Y. Jan. 12, 2009); *Rodriguez v. Keane*, No. 00-CV-1866, 2003 WL 21673624, at *1 (S.D.N.Y. July 16, 2003).

## 1.    Rule 60(b)(1):  Mistake, Inadvertence, Surprise, or Excusable Neglect

Dissatisfaction with a judgment does not sufficiently justify an allegation of mistake under Rule 60(b)(1). *In re Bulk Oil (USA) Inc*., Nos. 89-B-13380, 93-CV-4492, 93-CV-4494, 2007 WL 1121739, at *10 (S.D.N.Y. Apr. 11, 2007).   "Rule 60(b)(1) affords a party relief from a material mistake that changed the outcome of the court's judgment." *Id*. (citation omitted).  It "will not provide a movant an additional opportunity to make arguments or attempt to win a point already 'carefully analyzed and justifiably disposed.'" *Id*.  (quoting *Matura v. United States*, 189 F.R.D. 86, 90 (S.D.N.Y. 1999)) (finding that the petitioner's delayed challenge was an improper attempt to use Rule 60(b)(1) to convince the court to reconsider the judgment).   Courts should not "reconsider issues already examined simply because Petitioner is dissatisfied with the outcome of his case.  To do otherwise would be a waste of judicial resources." *Id*. (citation omitted); *see also Serrano v. Smith*, No. 05-CV-1849, 2009 WL 1390868, at *2 (S.D.N.Y. May 13, 2009).

## 2.    Rule 60(b)(2):  Newly Discovered Evidence

A motion brought under Rule 60(b)(2) referring to

> 'newly discovered evidence,' may refer either to evidence pertinent to the federal habeas proceeding or to evidence that might have been submitted in the State criminal proceeding.   Nonetheless, the procedural object of the motion authorized by Rule 60(b) is simply

to *vacate the federal judgment dismissing the habeas petition*, not to vacate the state conviction.

*Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (emphasis added).

### 3. Rule 60(b)(6): Any Other Reason that Justifies Relief

A Rule 60(b)(6) motion requires a showing of "extraordinary circumstances" to "justify[ ] the reopening of a final judgment." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988) ("The Rule . . . should only be applied in 'extraordinary circumstances.'") (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)); *Mendell v. Gollust*, 909 F.2d 724, 731 (2d Cir. 1990) (finding that relief under Rule 60(b) may be granted "only upon a showing of exceptional circumstances"); *Winslow v. Portuondo*, 599 F. Supp. 2d 337, 341 (E.D.N.Y. 2009).

"Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6) . . . ." *Agostini v. Felton*, 521 U.S. 203, 239 (1997). The Supreme Court has defined extraordinary circumstances that justify relief under Rule 60(b)(6) motions as errors which rise above "excusable neglect." *Klapprott v. United States*, 335 U.S. 601, 613 (1949); *see also Harrison v. Senkowski*, 247 F.R.D. 402, 413 (E.D.N.Y. 2008).

The Court of Appeals for the Second Circuit has declared that Rule 60(b)(6) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case." *Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004) (quoting *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir. 1986)).

### B. Rule 60(b) Motion or Successive Habeas Petition

Rule 60(b) relief with respect to a *habeas* petition that has been denied is available only when the motion "attacks the integrity of the habeas proceeding." *Harris v. United States*, 367

F.3d 74, 77 (2d Cir. 2004) (citing *Rodriguez*, 252 F.3d at 191). A Rule 60(b) motion attacks the integrity of a habeas proceeding if it does not "assert, or reassert, claims of error in the movant's state conviction." *Gonzalez*, 545 U.S. at 531. When, instead, a Rule 60(b) motion asserts a federal basis for relief from a state court's conviction, it is "in substance a successive habeas petition and should be treated accordingly." *Id.*; *see also Harrison*, 247 F.R.D. at 413-14; *Oyague v. Artuz*, No. 98-CV-6372, 2008 WL 5395748, at *6 (E.D.N.Y. Dec. 12, 2008). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), successive federal *habeas* petitions requesting relief from a conviction in state court must satisfy strict requirements before a district court can adjudicate them on the merits. 28 U.S.C. § 2244(b); *see also Harrison*, 247 F.R.D. at 417-18; *Oyague*, 2008 WL 5395748, at *7.

A Rule 60(b) motion is treated as a successive *habeas* petition when it "attacks the federal court's previous resolution of a claim *on the merits*." *Gonzalez*, 545 U.S. at 532 (emphasis in original). The motion does not amount to a successive petition where it "attacks, not the substance of the federal court's resolution of a claim on the merits, *but some defect in the integrity of the federal habeas proceedings*." *Id.* (emphasis added); *see also Harrison*, 247 F.R.D. at 413-14; *Graves v. Smith*, 811 F. Supp. 2d 601, 607 (E.D.N.Y. 2011) *aff'd sub nom. Graves v. Phillips*, 531 F. App'x 27 (2d Cir. 2013).

### C.    Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added). The "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Somerville v. Conway*, 281 F. Supp. 2d 515, 518-19 (E.D.N.Y. 2003).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *See Strickland*, 466 U.S. at 687. This test applies to a claim of ineffective assistance of counsel at any stage of the litigation. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, -- U.S. --, 134 S.Ct. 1081, 1089 (2014) (per curiam) (citation omitted). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

Reasonable strategic choices by counsel after an appropriate investigation of the facts and law are "virtually unchallengeable;" those "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91. Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691.

Courts "apply a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015) (citation omitted). "Second guessing from the federal bench is seldom appropriate on tactical and strategic issues of counsel made in the heat of trial." *Hamilton*, 94 F. Supp. 3d at 477-78.

## V.     Application of Law to Facts

### A.     Motion Arises in Part Under Rule 60(b)

This is an unusual case. Petitioner's request for relief could be addressed as either a Rule 60(b) motion or a second *habeas* petition. Included in his original *habeas* petition were claims relating to the alleged fabrication of evidence with respect to the palm print. *See supra* Part II.B.1. These claims were considered and found to be without merit; there was no evidence suggesting that the palm print might have been a fabrication or mistake. *Hamilton*, 94 F. Supp. 3d at 480-81.

Yet, petitioner's current request for relief is also a challenge to the integrity of the prior *habeas* proceedings. This court reached a decision on the merits before petitioner had an opportunity to present all evidence; it was found that the absence of the duct tape from the record did "not support granting the [*habeas*] petition." *Id*. at 481.

### 1.     Claims Relating to Newly Available Tape Evidence Allowed Under Rule 60(b)

In his Rule 60(b) motion, petitioner raises three main claims relating to the latent print evidence retrieved from the duct tape: (1) petitioner's trial counsel was ineffective since he failed to obtain expert examination of the allegedly exculpatory tape at the time of the state trial; (2) petitioner's trial counsel was ineffective because he allowed the "unidentified, unauthenticated computer print-out of a latent [print]" to be improperly introduced at trial; and (3) there is "ample evidence of police and prosecution bad faith, even fraud, in the presentation of the blank tape,

crumpling and mishandling of the tape, the missing photograph, and the unidentified computer print-out[.]" Mot. to Alter J. at 2-3.

Although these claims were previously addressed by this court, they are not barred as a second *habeas* petition to the extent they rest on allegations of fraud based on the re-examination of the newly available tape evidence. Construing those parts of petitioner's motion that relate to the recovered duct tape as arising under Rule 60(b) is in the interest of the efficient administration of justice. The atypical aspects of this case require the court to examine complex factual evidentiary questions with the assistance of qualified experts. While evidentiary hearings are generally discouraged in *habeas* petitions, the court considered one necessary in this case. An evidentiary hearing allowed the court to properly assess critical evidence which was previously unavailable. This court's factual investigation should relieve the Court of Appeals for the Second Circuit from having to authorize further fact-finding and will provide it with a complete record for its consideration in the context of the present pending appeal.

### 2.    Remaining Claims Dismissed

Petitioner raised additional claims attacking his state court conviction. These claims must be dismissed. They constitute a second *habeas* petition couched in the language of a Rule 60(b) motion, requiring prior authorization from the Court of Appeals for the Second Circuit. *See Oyague*, 2008 WL 5395748, at *9-10; *see also supra* Part IV.B.

Specifically, petitioner alleges that his trial counsel was ineffective because he failed to challenge inculpatory statements made by petitioner's relatives at trial. *See* Mot. to Alter J. at 3. This claim is a further attack on the merits of his state conviction and is not properly raised in the context of a Rule 60(b) motion.

Petitioner also argues that he was denied due process of law and his rights to confrontation when

> the unidentified, unauthenticated computer print-out of a latent was improperly introduced at trial through a witness who was not qualified to authenticate it and without the jury's knowledge of the exculpatory evidence discovered at the hearing, including the fact that the witness who identified it reported that it had been developed by a method that in fact was not used.

Pet'r's Post-Hr'g Mem. in Supp. of Rule 60(b) Mot., May 8, 2016, ECF No. 166 ("Pet'r's Post-Hr'g Mem."), at 18 (footnote and citation omitted). This, too, is an attack on the merits of petitioner's state proceedings and must be dismissed as improperly raised. To the extent that petitioner attempts to formulate this allegation as related to the newly available evidence that is the subject of the instant Rule 60(b) motion, the claim fails.

*First*, as explained in detail below, the evidence adduced at the hearing was not "exculpatory." *See infra* Part V.C. *Second*, Jean's testimony regarding how she developed the latent print raises no new evidentiary concerns and does not support petitioner's speculative allegations of fraud. *See, e.g.*, Pet'r's Post-Hr'g Mem. at 23 (stating that "the report of the print examiner that the latent was created by a 'lift' rather than superglue fuming supports the inference that during the three month undocumented hiatus, petitioner's print was 'lifted' and placed on the duct tape"). At the evidentiary hearing, Jean testified that she did not "lift" a print; she developed a latent print through cyanoacrylate—or Superglue—fuming and application of Ardrox dye stain. *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 130:19-131:4 (stating that she "do[es] not lift fingerprints," she develops them). This is consistent with her testimony at petitioner's state trial. *See* Trial Tr. at 152:18-153:12 (recounting the fuming process and dye application), 157:22-24 (testifying that she did not "lift" a print; she "developed" one). Challenges to her testimony and

any purported inconsistency with the testimony of Detective Kennedy (the print examiner) are a further attack on the merits of the state proceedings.

Finally, to the extent that petitioner "incorporates" in his Rule 60(b) motion other claims previously raised in his *habeas* petition, these are also dismissed as amounting to a second *habeas* petition. *See, e.g.*, Pet'r's Post-Hr'g Mem. at 15, 18, nn.3-4.

## B. Motion is Timely

A Rule 60(b) motion made on the basis of mistake or newly discovered evidence must be brought within one year after the judgment was entered; otherwise, it should be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1); *see also Esposito v. Ashcroft*, 288 F. Supp. 2d 292, 295 (E.D.N.Y. 2003) *aff'd*, 392 F.3d 549 (2d Cir. 2004). To determine whether a Rule 60(b)(6) motion is timely, a court must "look at the particular circumstance[s] of each case and 'balance the interest in finality with the reasons for delay.'" *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 190 n.8 (2d Cir. 2006) (citation omitted).

Petitioner's Rule 60(b) motion is made within one year of this court's judgment of March 27, 2015. It is made one month after petitioner's expert was able to examine the previously unavailable duct tape. The Rule 60(b) motion is brought within a reasonable time. It is timely.

## C. Motion Fails on Merits

The decisive question before this court is whether the newly available duct tape evidence supports a finding that petitioner's constitutional rights were denied through fraud. *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 94:5-9; *see also supra* Part V.A.1. Petitioner seeks relief pursuant to Rule 60(b)(1) (mistake), Rule 60(b)(2) (newly discovered evidence), and Rule 60(b)(6) (any other basis justifying relief). *See* Mot. to Alter J. For the reasons stated herein, the motion fails. Petitioner has failed to demonstrate a mistake of this court; the re-examination of the tape confirms

this court's original findings; and no "extraordinary circumstances" warranting relief have been presented.

Nothing in the evidentiary hearing puts into question this court's decision denying petitioner's writ of *habeas corpus*. In that decision, petitioner's ineffective assistance of counsel and fabrication claims were considered and dismissed as without merit. The additional evidence submitted in the instant Rule 60(b) motion indicates that Jean properly preserved the latent print she developed in 2005 by capturing a digital image of it and storing it on the NYPD's "More Hits" database; this latent print image was sent to the NYPD's latent print identification unit, where it was positively matched to petitioner's inked print exemplar; appropriate print image cards were used for this comparison; and a ridge detail continues to be visible on the tape ten years later and despite the destructive effects of Hurricane Sandy.

Respondent accurately stated the court's findings:

> At the conclusion of the evidentiary hearing, this Court found Criminalist Jean's hearing testimony honest and credible, and found the hearing testimony of petitioner's expert witness McEvoy unpersuasive, not credible, and of no probative force.
>
> [This Court] concluded that there is no photograph and never was a photograph of the latent print, independent of what was obtained through material introduced into the computer. This Court also found no evidence that Criminalist Jean "fabricated what she did" or that she, "acting with others, fabricated evidence." This Court further found that "[t]here was more than sufficient evidence to convict this defendant [and there] isn't the slightest iota, or scintilla, or hint that [Criminalist Jean] operated in any way maliciously to convict this defendant" or to "fabricate evidence."

Resp't's Post-Hr'g Mem. in Opp'n to Pet'r's Rule 60(b) Mot., May 9, 2016, ECF No. 168 ("Resp't's Post-Hr'g Mem."), at 16 (internal citations omitted).

Jean recounted her 2005 examination of the duct tape, the development of the latent palm print, and the steps she took to preserve that evidence which was then used by a separate detective

to match petitioner's inked print. Her process was reasonable and in accordance with then applicable NYPD practice. While petitioner's experts have suggested alternative processes for the preservation of the latent print, they do not cast doubt on the appropriateness of the police practices in 2005, with which Jean complied. The evidentiary record, including extensive hearing testimony, failed to produce any indication that the tape was improperly examined or handled. The court's original findings are confirmed.

### 1. 2005 Tape Examination

Jean testified that she was assigned to the instant case on January 24, 2005. Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 97:21. Her role at the NYPD Lab was to *develop* any latent prints—she was not responsible for *comparing* prints. *See* Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 199:21-200:14; *see also* Trial Tr. at 158:8-23.

### a) Print Development

Her examination focused on the three tape ligatures with which the victim was bound. *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 96:23-25. She received the evidence as property that had been vouchered by the NYPD, with voucher number L275795. *Id*. at 97:1-7. Initially, she checked that the package containing the ligatures was "signed and sealed." *Id*. at 98:4-6. It was. *Id*. at 98:6. She then proceeded to examine the evidence on January 31, 2005.

*First*, she conducted "a visual examination, looking for any patent prints." *Id*. at 98:12-14. She explained that "[p]atent prints are fingerprints which are visible to the naked eye, be it in blood, dirt, oils." *Id*. at 98:14-16. No patent prints were visible on the tape. *Id*. at 98:16-22.

*Second*, Jean examined the duct tape "using an alternate light source, such as an ultraviolet light." *Id*. at 98:23-24. Alternate light sources are used "because it's said that some environmental

contaminant[s] such as bleach can cause . . . prints to naturally fluoresce." *Id*. at 98:24-99:1.  She

examined all three pieces of tape under this light and did not observe any prints. *Id*. at 99:2-3.

*Third*, she employed a Superglue fuming process, *i.e.* cyanoacrylate fuming.  Garrett,

petitioner's expert, recognized the value of this technique for the development of prints. *See id*. at

13:8-14:2.  Jean did not observe a print on the pieces of tape:

> The next thing I did was a Superglue fuming process.  In this step, I
> take the evidence.  It's placed into an airtight chamber.  In this
> chamber, there is a hotplate with water brought to a boil and an
> aluminum cup or tray.  I take some Superglue and I place it into the
> aluminum tray.  It evaporates off and it adheres to any moisture
> that's on the object.
>
> I then vent the chambers, and I then re-examine the evidence,
> looking for any patent prints again, because Superglue leaves a thin
> white coating.  I did not see any patent prints of Superglue on any
> of these ligatures.

*Id*. at 99:4-14.

*Fourth*, she sprayed the tape with Ardrox, a fluorescent dye stain.  This time, Jean

developed what she considered an "of value" print. *See* Hr'g Tr., Apr. 8, 2016, ECF No. 171, at

188:7-15 (stating that she developed what she considered to be an "of value print" and explaining

that she was trained "to make a determination of what is of value and what could be submitted for

identification").  She explained the technique employed:

> I take the evidence to a chemical hood and I spray it with fluorescent
> dye stain.  In the case, it was Ardrox.  I spray it.  I allow it to dry,
> and then I can examine it using an alternate light source.  We add
> the Ardrox dye stain for contrasting color.
>
> I examined three items and I did find one print on -- it was the first
> item on the voucher, and it was the duct tape ligature of the ankle.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 99:23-100:5.

### b) Print Preservation

Jean marked the area of the tape where she had developed the latent print with brackets and the identifier "AJ#1"—her initials, as well as the number one indicating print number one. *See* Jean Letter at 1; Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 106:20-23. She then used a digital camera to capture an image of the developed print. *See* Hr'g Tr., Apr. 7 2016, ECF No. 162, at 101:17-18.

The camera was directly connected to a computer, and linked to "More Hits," the NYPD program used at that time to archive digital images, preserve their authenticity, and track their chain of custody. *See id.* at 102:3-7, 110:8-111:3; *see also* Resp't's Post-Hr'g Mem. at 6 ("'More Hits' was an image capturing database that tracked the chain of custody for the image, verified authenticity, and preserved the integrity of and archived the image.") (footnote omitted). Jean explained:

> Q.    What was the reason, as a criminalist, you were capturing the image and putting it into More Hits in that fashion? Why were you doing that?
>
> A.    Because More Hits is a -- *it's an image capturing database that tracks the chain of custody for the image, and it tracks -- it verifies authenticity and preserves the integrity of the image.*
>
> Q.    So if you had gone back in at a later date and done something different to that particular image, there would be a record of it because of the More Hits program?
>
> A.    Correct.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 102:22-103:7 (emphasis added). The purpose of the "More Hits" program is not in dispute. Garrett agreed that it served to protect an image's chain of custody and keep track of any changes:

> Q.    And what is the purpose that an agency would use More Hits for, an agency like the police lab?

A.     To catalog the images they have on a specific case, keep track of those images on that case, put in information about the images like you normally would, with notes that would attach to a particular file or a particular image, and also to track any enhancements or changes that you made to that image.

Q.     And to protect the chain of custody with respect to the image; correct?

A.     Yes.

*Id*. at 60:16-25.

The digital camera was plugged into the computer at the time Jean took the picture. The captured image appeared on the computer screen. After she was satisfied with the image's quality, Jean selected "acquire" from the "More Hits" menu on her computer screen, and the image was directly imported from the camera into the "More Hits" program:

Q.     You say you uploaded the image that you took to the More Hits system?

A.     Correct.

Q.     How did you do that?

. . .

A.     Through More Hits, there's a button called "acquire," where you take the image from the camera and it puts it into the More Hits system.

Q.     Where is that button?

A.     On the menu of the program.

Q.     Well, when you have the camera in hand, it has an image in it that you've taken?

A.     Correct.

. . .

Q.     Where is the camera when you upload?

| | |
|---|---|
| A. | It's plugged into the computer. |
| Q. | Into your computer? |
| A. | Correct. |
| Q. | Okay. And you say you see an image on the screen? |
| A. | Yes. |
| Q. | And then you push a button that says "acquire"? |
| A. | Correct. |
| Q. | And where is that button? |
| A. | On the -- it's a button on the menu of the program. |
| Q. | On the screen? |
| A. | On the screen. |
| Q. | Okay. And that word, "acquire," the button that you press, sends something to More Hits? |
| A. | *It retrieves the digital -- the file that has the digital image and pulls it into the program.* |

*Id.* at 110:8-111:15 (emphasis added); *see also* Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 145:11-147:8.

The digital image, together with the image's "digital file"—rather than a traditional copy of a photograph—was *directly* uploaded from the camera to the "More Hits" program. No files remained in the camera. *See* Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 148:3-14, 218:13-16 (Jean testifying that there was no "residual photograph left in the camera after the information was transmitted into the computer").

After photographing the print and uploading the image to "More Hits" on January 31, 2005, Jean placed the duct tape back into its original packaging, sealed it, and returned it to the evidence

control desk of the laboratory.  *See id*. at 168:23-169:3.  Then, on February 4, 2005, she enhanced

the digital images that were stored on "More Hits" and completed her examination:

> Q.      What was going on between January 31st with the sealed
>         evidence and February 4th, the completion date?
>
> A.      Nothing. On February 4th is when I did my enhancements
>         on the images and that would complete my examination.  But
>         I did not have the physical evidence[,] I had to work on the
>         pictures which at that point would have completed my
>         examination.
>
> Q.      So you were not examining the duct tape between January
>         31st and February 4th?
>
> A.      Correct.

*Id*. at 169:6-15.  Jean explained the "enhancement" process:

> Through More Hits, Photoshop is opened.  Photoshop opens a copy
> of the original image that was acquired.
>
> I then do some processing or enhancing.  At the time, we called it
> enhancements.  I do processing on the images just of varying --
> making it black and white and changing -- making it brighter or
> lighter in certain areas.  It's then printed and sent over to the Latent
> Print Section of the police department.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 102:12-20; *see also id*. at 121:15-20.

At the close of her examination, Jean logged the images in a chain of custody logbook, and

"burned" the images from the "More Hits" program onto a compact disk ("CD"), which was then

sent to One Police Plaza to be archived in accordance with applicable procedures:

> Q.      And what did you do with those images?
>
> A.      It gets logged in a chain of custody logbook, and then at the
>         time when it's being sent over it's placed onto -- it's placed
>         with other photographs and all the images are burned into a
>         disk and it's sent off with the courier to One Police Plaza.
>
> Q.      You mean before it's sent over to One Police Plaza, the
>         images are burned into a disk?
>
> A.      Yes.

Q.      Do you have that disk?

A.      It's sent to One Police Plaza.

        . . .

Q.      And that CD would have -- would be evidence of the images
        before they got to One Police Plaza; is that right?

A.      They would be images, the same images that are printed out
        on the paper.

Q.      But they would be digital files --

A.      Yes.

Q.      -- of the photographs that you took prior to them being sent
        to One Police Plaza?

A.      They would be images from More Hits put onto the disk and
        then sent over with the images.

Q.      But they would be digital files?

A.      Yes.

*See id.* at 122:13-123:12.

Jean explained that this process was consistent with NYPD practice at the time.  The

standard procedure was to preserve developed latent prints "by taking a photograph, leaving [the

developed print] intact on the evidence with a bracket around it and a unique identifier."  Jean

Letter at 2.  She explained that "preserving" the print by camera, rather than through excision or

by "lifting" the print off the surface with tape, "makes future examination possible."  *Id.* at 1.

The applicable Standard Operating Procedures confirm Jean's testimony.  The NYPD

relied on "More Hits" for the collection and preservation of latent print images:

> **PURPOSE**: *To capture and enhance any digital image of a latent*
> *fingerprint or an image of any other form of physical evidence by*
> *utilizing the More Hits Imaging System.*
>
> **POLICY**:  It is the Policy of the Latent Fingerprint Development
> Unit to digitally photograph all latent fingerprints that are developed

on any submitted evidence, which in the opinion of the examiner, may possibly be of value (see FEAS-38). Absent any exigent circumstances, *all latent print images will be captured using the More Hits Imaging System, which provides both documentation and security for the images*. The examiner shall enhance the original image to the best of their ability in order to provide the greatest contrast between the substrate and the latent print. *All digital images shall be archived through the appropriate electronic media.* (See FEAS-QC4) These archived images shall be considered evidence and shall be sealed and stored in a locked cabinet in room #442. Access to this cabinet is limited to the Unit Supervisor or a designee. A chain of custody logbook will be maintained with the electronic media.

All digital images of latent fingerprints shall be electronically duplicated and these duplicated images shall be forwarded to the Latent Print Unit for this Department for further evaluation. Printed copies of these images may be produced and may be forwarded to the Latent Print Unit for further evaluation. Both the electronically duplicated images and the printed copies of these images shall be considered evidence. These shall be handled according to section 25.3.

Resp't's Ex. 1 (2005 NYPD Police Lab Standard Operating Procedures) at Sections 25, 25(1) (emphasis added); *see also id.* at FEAS-QC4.2 (providing guidelines for the archiving of images through "More Hits"); Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 202:4-23 (Jean explained that Section 25 of the 2005 Standard Operating Procedures provided that all photographs were to be inputted into "More Hits" in order to "maintain the authenticity of the photo," to "archive it," and preserve the chain of custody).

Petitioner's print expert, Garrett, initially suggested that the proper way of preserving a piece of evidence with something of value, such as a print, would be to excise that piece of evidence—*i.e.*, separate it from the rest of the specimen—and mark it. August 2015 Garrett Report at 2-3. He faulted the NYPD for not doing so in the instant case. Yet, at the hearing, he conceded that preserving the relevant specimen by capturing a digital image of it was also appropriate:

> Q.    [T]he area, there's some kind of markings there, they look to be black. Are those brackets that typically a latent print

> developer or criminalist would use to show an area where she found something of value?

A.      Yes.

Q.      And it's also -- there also seems to be "AJ" below that on a ruler?

A.      Correct.

      . . .

Q.      *So is it common practice for a criminalist who is doing this type of work, when they find an area where they think they have something of value they would bracket it and their initials would be in the area where they found that information; correct*?

A.      *That is correct.*

Q.      And you also talked about the fact that, in your experience, you would cut away the item or the area away from the item and then keep it separate from the item when you were doing your evaluation of it; is that correct?

A.      Yes.

      . . .

Q.      *. . . Is it also possible to keep the item intact and then take the photo of what you believe to be a latent print*?

A.      *Of course it's possible, yes.*

Q.      *So your way is not the only way*?

A.      *I guess there are a lot of different ways people can do things.*

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 68:11-69:21 (emphasis added).

### c) Metadata

Respondent produced the metadata associated with the digital images of the latent print developed from the duct tape in 2005. *See* Resp't's Ex. 19 (NYPD Lab Computer Metadata Print-Out). The file includes four images: two "unenhanced" shots of the developed latent, and two

corresponding "enhanced" images showing the digital enhancements that were applied to each shot through Photoshop. *See id.* Among other things, the data from the file shows that the images were initially "acquired"—*i.e.*, taken—on January 31, 2005 and then processed—*i.e.*, digitally enhanced—on February 4, 2005. *See id.* This is consistent with Jean's testimony.

Petitioner points out that some information, such as the type of camera used, is not included in the latent print's digital camera file. *See, e.g.*, Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 117:2-5. Jean acknowledged that the metadata collected in 2005 by the "More Hits" program was not as comprehensive as that available today. *See id.* at 115:9-12 ("What I'm saying is, the technology at the time, all the information, the common information you know now today as Metadata, was not captured through More Hits in the way that you're expecting today, in 2016."). At the time of her examination, she manually supplemented the information gathered automatically by "More Hits," adding data such as the lab number, the identifier "AJ#1" and its location, the process used to develop the print, and the crime. *See id.* at 113:15-114:19.

She explained that it was not standard procedure to maintain a separate photo log, because "More Hits" tracked chain of custody and other relevant details relating to an image:

> Q.   [D]id it behoove you more importantly to have a photo log to document the kind of image, the camera that you used, the apertures, the sequential number of the prints that you were making or the images you were taking?
>
> A.   It was not standard operating procedure to have a photo log because More Hits tracked chain of custody and everything of the image.

*Id.* at 115:13-20.

Garrett recognized that, with digital images, information relating to a particular picture—such as the time and date it was taken—is automatically included by the camera or the software program associated with the camera, obviating the need for a traditional "logbook":

> Q. Is it the practice in the field to make notes of the camera brand and model, the date and time that the image was taken by that camera?
>
> A. Well, it was at one time when we used conventional photography, film-based photography. For the most part nowadays when people are using digital photography, there are -- *the cameras themselves or the software program associated with the camera puts that information in automatically*.
>
> Q. And that's known as the camera file?
>
> A. That's known as the Metadata, which is attached to the image file.
>
> Q. The image from the camera?
>
> A. Yes.

*Id*. at 46:16-47:4.

## 2. No Missing "Photograph;" Digital Camera Used

Petitioner does not contest that the image of the developed latent print used at trial *matches* petitioner's inked print exemplar, taken at the time of his arrest. *See, e.g.*, Hr'g Tr., Mar. 20, 2016, ECF No. 75, at 25:4-8. He also acknowledges that the latent print image cards used at trial came from "More Hits," the NYPD's image database in use at that time. Instead, he argues that this latent print image was not an "*original* photograph" of what was developed by Jean in 2005. As explained by Garrett:

> Q. Is it the image from the More Hits system?
>
> A. It is numbered and coded, so it appears to come from that More Hits system, yes.
>
> Q. Right. *So that is not the original image as the camera took it. It's the image that was inputted into the More Hits system*?
>
> A. That would be correct.

Q.    Now, *based on those non-original photographs from the More Hits system, you do make a positive comparison with Hamilton's inked exemplar, do you not*?

A.    *That's correct.*

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 55:8-18 (emphasis added).

Petitioner contends that, "because we believe that there's an original file that is being kept from us . . . we cannot rule out that there was manipulation or fakery of some sorts here." Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 161:1-3.  At the evidentiary hearing, petitioner's forensic photography expert, Robert McEvoy, testified that he did not see "an original image" of the latent print developed in 2005 in the files he examined.  *See, e.g.*, *id*. at 215:19-216:1.  According to his testimony, there was an original digital file "some place in the [More Hits] system" which had not been produced.  *See id*. at 219:13-24; *see also id*. at 221:11-15.  He claimed knowledge of the relevant 2005 NYPD program and procedures because he is "friends with the people that designed the system" and they "talked about the system."  *Id*. at 219:7-11.

The argument that an "original photograph" or camera file is allegedly missing has no merit.  Jean, through detailed and credible testimony, explained that there is no phantom "original photograph."  She thoroughly described how she used a digital camera to capture an image of the developed latent palm print.  That digital image was directly uploaded onto the "More Hits" program, which stored the image, the accompanying metadata, and tracked any changes made.  Jean then used Photoshop, opened through the "More Hits" program, to digitally apply certain enhancements to the print image, in accordance with appropriate NYPD practice.  A record of these enhancements is included in the image's metadata file.  *See* Resp't's Ex. 19 (NYPD Lab Computer Metadata Print-Out).  As credibly confirmed by Jean at the hearing, "*there is no photograph independent of what we have through material introduced into the computer.*"  Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 159:24-160:3 (emphasis added).

Jean's testimony has now also been confirmed by petitioner's expert, McEvoy. At petitioner's request, respondent was ordered to provide him with a copy of the CD containing the images taken by Jean in 2005, which she referred to in her hearing testimony. *See id.* at 198:21-24. On April 20, 2016, respondent sent petitioner a CD including images taken in 2005 and 2016, which "were copied from the CD on which the NYPD Lab maintains a record of photographs taken in connection with this case as well as many others." Resp't's Letter of Apr. 20, 2016, ECF No. 161. Petitioner now acknowledges that the CD it received contains the "original camera file," but that information as to the type of camera used is missing: "Mr. McEvoy has since reviewed the disc and has reported that *it contains the original camera file*, but without the original camera data such as the make and model of the camera, the serial number, exposure settings, metering and flash use, etc." Pet'r's Post-Hr'g Mem. at 6 (emphasis added).

Based on the extensive hearing testimony, it is concluded by the court that the digital images stored on the "More Hits" program, together with the accompanying metadata tracking details such as when the images were taken and how they were modified, *are* the "original camera file." As explained by Jean:

> Q.   Now, do you know if there is a way to access the original camera image through the More Hits system?
>
> . . .
>
> A.   To my knowledge, the image that is pulled -- *the information that is pulled into the More Hits system is the original file*.
>
> Q.   *The original camera file*?
>
> A.   *Yes.*

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 111:25-112:8.

Garrett appeared to agree:

Q.     And are there members within [the International Association for Identification] that use the More Hits program in a way that they have a photo go immediately from the camera to the More Hits program on a computer?

A.     That's one way of acquiring it.  I don't have any personal knowledge of that.

Q.     But I'm asking you if that's a common practice in the field?

       . . .

A.     There are two ways to do it. One is with independently having the camera, taking a picture.  You then take that file and input it into the More Hits system.

       *Another way to do it is to have what's known as a tethered camera, where the camera is actually hooked up to the computer system where More Hits resides and then doing the capture through the More Hits software*.

Q.     Do you have any knowledge with respect to what the New York Police lab does?

A.     Not specifically, no.

Q.     *Now, you also talked about -- you keep on going back to this original photo. If the agency uses the system in which the camera is tethered to a computer, the original photo would be the one that goes into the More Hits program; isn't that correct*?

A.     *I believe so*, but I'm not going to represent myself as an expert on More Hits.

*Id*. at 62:-64:1 (emphasis added).

Allegedly missing information on the type of camera used does not raise concerns with respect to the reliability of the camera file and the print images it contains, which were digitally preserved through appropriate systems and procedures.

### 3.    Print Image Cards Appropriate For Comparison

This original camera file is what was printed and reproduced on the latent print image cards used at trial to positively match petitioner's inked print exemplars.  As testified by Jean:

> Q.    When you testified at trial that you wanted to see your original photo -- I'm going to show you Court Exhibits 2 and 3, were these the items that you were referring to when you were referring to original photos?
>
> A.    Yes.
>
> Q.    And were these the photos that were sent to the latent print identification unit at 1 Police Plaza?
>
> A.    Yes.

Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 202:24-203:6; *see also id*. at 175:3-5 (Jean testifying that all the images she took in 2005 are included in Court Exhibits 2 and 3); Ct. Exs. 2 and 3 (Original Latent Print Image Cards) (on file with respondent); Pet'r's Ex. 9 (Photocopy of Latent Print Image Cards).

Petitioner's fingerprint expert, Garrett, initially testified that the photocopy he received of the latent print images developed in 2005 was not of a sufficient quality for him to use in determining whether there was a match between the latent print and petitioner's inked print exemplar.  Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 12:3-12.  The document he received was a color copy of the latent print image cards used at trial.  *See* Pet'r's Ex. 9 (Photocopy of Latent Print Image Cards).  Garrett testified that he "wanted either a photo-quality re-production of the latent images or access to the digital file from which they were created."  Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 12:23-25.

The latent print image cards used at trial were produced by respondent at the evidentiary hearing and marked as Court Exhibits 2 and 3.  Garrett reviewed them and confirmed that these print image cards are exactly the kind of images he regularly uses to make a print comparison:

A. Well, the photographs which you just gave me on the glossy paper, the images are images that are reproduced here are superior to what was on this other paper that's marked Petitioner's Exhibit 9.

Q. Could you use them to make a comparison?

A. These, I could use and actually in the work that I do in New York, *this is usually what's presented to me and I work from these all the time*.

*Id*. at 43:14-21 (emphasis added); *see also id*. at 64:17-22 ("Q. Have you received those types of photos before during the course of your work as an expert where you testify in the courts in New York City, primarily the State Courts? A. Yes, I have. Q. And that's normally what you receive; correct? A. That is correct."); 65:8-14 ("However, these are the type -- when I come into New York to look at fingerprints, I'm usually presented with this type of specimen, all right, which I find to be adequate. I can examine it there, either under magnification, or I usually bring a scanner with me and I scan it in under high resolution, and I find it to be perfectly adequate for my purposes."); 66:6-14 ("Q. And that's what you normally would compare if you were asked to do so? A. That is correct. Q. So this is what happens in courts in New York City on a regular basis? . . . A. In my experience, yes.").

Both Detective Kennedy, at the time of Hamilton's state trial, and petitioner's expert Garrett, in the context of the *habeas* petition before this court, made a positive comparison between the latent print images stored on the "More Hits" program and petitioner's inked print exemplar. *See id*. at 55:15-18; Trial Tr. at 212:10-13.

The 2005 record confirms this court's original finding; no evidence has been presented suggesting that the inked and latent prints—as shown on the images introduced at trial—were a fabrication or mistake. Hr'g Tr., Mar. 20, 2015, ECF No. 75, at 27:23-28:2 ("That's the claim with no basis at all because we now have a concession that there is a match with the photographs

50

which appear to me and would appear to the average counsel with minimum skills sufficient to meet constitutional requirements to be clear enough.") (court's statement).

### 4.    2016 Tape Re-examination

Following his August 2015 examination of the tape, petitioner's expert Garrett raised doubts as to the existence of a latent palm print. *See* August 2015 Garrett Report; *supra* Part III.B. Jean noted that future and more accurate re-examination of the tape was possible. *See generally* Jean Letter. Additional analysis of the tape was ordered.

The results of the 2016 re-examination confirm this court's original findings. Contrary to Garrett's conclusions, Jean was easily able to identify the area of the tape where she had originally developed the latent print, because this was marked "AJ#1." She observed a ridge detail by using special light and re-applying Ardrox stain. *See* Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133. The ridge detail was clearly visible in the photographs Jean took of the tape on January 26, 2016, which she marked and described at the evidentiary hearing. *See* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 30:8-32:7; Resp't's Exs. 20T, 20Q (NYPD Photographs of Re-examined Tape); Pet'r's Exs. 27H, 27G (same). Garrett himself acknowledged this, confirming that the area of the image identified by Jean was "*characteristic of ridge detail.*" Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 32:21, 23 (emphasis added).

#### a) Latent Print Durability

The tape was recovered from an NYPD evidence warehouse which had been previously inaccessible because partially submerged by Hurricane Sandy. According to petitioner's expert, any damage caused by the hurricane would not have affected the prints. Garrett stated that (1) the duct tape specimens did not appear to have been damaged by water (with the exception of the duct tape roll); and (2) any prints developed by Jean using the cyanoacrylate fuming process "would

not have been affected or dissolved by exposure to moisture or immersion in water." Suppl. Report of Robert J. Garrett, Oct. 7, 2015, ECF No. 98-1.

Jean disagreed. She explained that Ardrox dye stain "*does* fade over time regardless of heat, friction or exposure to moisture." Jean Letter at 2 (emphasis added). She further noted that "cyanoacrylate fuming could fade and/or disappear . . . over time due to high heat and friction." *Id*. Garrett acknowledged as much at the evidentiary hearing:

> Q.     And in that report, she said that heat and friction could have faded the cyanoacrylate-fumed print, did she not?
>
> A.     Yes.
>
> Q.     Do you know of any evidence for that supposition?
>
> A.     If it's extreme heat, something that would compromise the surface on which the print was found, that's a possibility. If it was friction provided by something that is harder than the plasticized print itself, that is also a possibility.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 20:10-17.

Petitioner's expert conducted experiments to test the durability of cyanoacrylate developed prints. He developed prints and then brushed them with "a small coarse bristled paint brush," exposed them to heat, and ran them through a dish washer cycle. *See* Suppl. Report of Robert J. Garrett, Jan. 7, 2016, ECF No. 121-1; Suppl. Report of Robert J. Garrett, Jan. 16, 2016, ECF No. 130; *see also supra* Part III.G.

Evidence of these experiments was introduced, but the tests were found to be invalid by the court:

> I'll allow the evidence of the experiment to come in. It's not a valid experiment because it doesn't take account of the time sequence. The latent print you were examining had been taken many years before. But it's coming in anyway. It seems to me of little probative force.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 26:18-23.

Garrett acknowledged that developed ridge details are not "indestructible":

> Q.    You also talked about when the [cyanoacrylate] fuming is done and the super glue or crazy glue attaches to what you believe is ridge detail that it's durable?
>
> A.    Yes.
>
> Q.    Is it completely indestructible?
>
> A.    No.
>
> Q.    And there are ways that it could be ruined or damaged at some point?
>
> A.    That is correct.

*Id*. at 72:25-73:8.

### b) Visible Ridge Detail

Out of the three pieces of ligature tape in evidence, the NYPD criminalists only re-examined the one recovered from the victim's ankle. Of this piece of tape, only the part that had been originally marked as "AJ#1" was re-examined:

> Q.    [H]ow were you able to find the area that you're referring to?
>
> A     . . . I put a bracket around it and my initials, AJ, and number one for print number one.
>
> Q.    And when you went there on January 26th, 2016, you were still able to see that bracket and your initials?
>
> A.    Yes.

*Id*. at 106:20-107:1.

*First*, the tape was visually observed through the naked eye and "white light," described as "LED and Halogen." *See* Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133, Criminalist Worksheet at 2. No ridge detail or patent print was observed. *Id*.; *see also* Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 106:17-19, 107:3-4.

*Second*, the evidence was examined through an alternate light source—*i.e.*, ultraviolet light. This time, a "ridge detail [was] observed, photos taken." Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133, Criminalist Worksheet at 2; *see also id.* at 3 ("Jean and I re-examined the evidence with ultra-violet light. Originally marked print was visible."). As explained by Jean at the hearing:

> The next thing I did was, I took an alternate light source, which was the ultraviolet light, and I examined that area that contained AJ-1 with the ultraviolet light to see if I could see any ridge detail. I did see small areas of ridge detail, which was shown to defense counsel, Stern, and expert witness, Garrett, and I did take photographs of those areas of ridge detail.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 107:5-11.

*Third*, after obtaining the parties' consent, criminalist Jean re-applied Ardrox dye stain to the location of the duct tape marked "AJ#1." The tape was air dried and examined through the ultraviolet alternate light source. *See* Police Lab Re-examination Report, Feb. 4, 2016, ECF No. 133, Criminalist Worksheet at 2. Again, a ridge detail was observed and photographed:

> Then there was the discussion of whether or not I would re-apply the dye stain, after some time, there was agreement to do it. And then I resprayed the evidence, that location where the AJ-1 was marked, and I sprayed it with the Ardrox dye stain that was used, the same chemical that was used in 2005.
>
> I allowed it to dry, and I then again examined it with an alternate light source, which was the ultraviolet light. And I did see some more ridge detail. I again showed it to defense counsel, Stern and expert witness, Garrett, and then I took more photographs.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 107:22-108:6.

Photographs of the observed ridge detail were produced and marked during the evidentiary hearing. *See* Resp't's Exs. 20Q, 20T (NYPD Photographs of Re-examined Tape); Pet'r's Exs. 27H, 27G (same). Jean identified the ridge detail that was observed on the tape during the

examination. She marked the area of the photograph where the ridge detail was visible. *See* Hr'g

Tr., Apr. 7, 2016, ECF No. 162, at 30:6-16, 31:1-32:7, 108:10-16.

Garrett reviewed the marked photographs. He testified that they did not show any "*usable*"

print for comparison purposes, but agreed that the area of the image identified by Jean was

"*characteristic of ridge detail*." *Id*. at 32:21, 23, 33:21-23 (emphasis added). He testified:

> COURT: Show the marked [photographs] to the witness, please.
>
> MR. STERN: Yes, sir.
>
> COURT: Don't you see the markings on them, sir?
>
> WITNESS: Yes, I do.
>
> Q. Is that ridge detail?
>
> A. It could be, yes.
>
> Q. It could be, but are you convinced it is?
>
> A. *It's characteristic of ridge detail.*

*Id*. at 32:13-21 (emphasis added); *see also id*. at 67:16-68:9 (testifying that "it appears that [the

circled areas] could be ridge detail"). He explained that the ridge detail was present in the part of

the tape that had been originally marked by Jean as the area where she had developed the latent:

> Q. Now, are you testifying here today that there's no print on that ligature?
>
> A. No.
>
> Q. What are you saying here today?
>
> A. Well, there's no identifiable print currently observed on that ligature.
>
> Q. And the ridge detail that was there, is that not in the same place that Alynka Jean indicated her latent print was when she did her initial investigation?

A.     *It appears under that mark that was made on the tape, indicating that there was a latent there.*

    . . .

A.     *So there could be ridge detail in that area in the photograph taken in 2016.*

Q.     And the area that we're talking about, these are the photos that were taken at Erie Basin on January 26, 2016, that were 20T and 20[Q], the ones you looked at with the judge and Ms. Jean?

A.     That is correct.

Q.     *The ridge detail, what could be ridge detail is in the same area where Alynka Jean initially said that she found a latent print; correct?*

A.     *Correct.*

*Id*. at 74:2-75:11 (emphasis added).

### c)     Court's Own Observation

The court examined the evidence of the January 2016 tape re-examination. It observed ridge detail in the photo, confirming what the experts could not miss seeing. *See id*. at 33:19-20.

### d)     Uncrumpling

Following his August 2015 examination, petitioner's expert noted that the tape was in a "crumpled" condition, which was "detrimental to the preservation of developed fingerprints and to future examination." August 2015 Garrett Report at 2. He opined that the tape would need to be "uncrumpled" in order to conduct useful future examinations:

Any further examination of the duct tape would need to be conducted in a laboratory or other place conducive to further processing. Only under such conditions would it be feasible to attempt to "uncrumple" the tape and try to locate any developed latent prints which could then be compared to the defendant's exemplar.

*Id*. at 3.

At the January 26, 2016 re-examination, Jean offered to "uncrumple," or flatten out, the duct tape. She testified that she had the necessary equipment to do so without damaging the evidence. Yet, petitioner's counsel did not allow this:

> Q.    Now, was there any discussion while you were there at the Erie Basin about trying to uncrumple or flatten out the duct tape?
>
> A.    Yes.
>
>        . . .
>
> Q.    Who said what?
>
> A.    I presented -- I'm going to say expert witness, Stern -- I mean Garrett and defense counsel, Stern, because they were together, if they wanted me to try to straighten it out, because it was crumpled over. And defense counsel, Stern, did not want it -- he said he didn't want it touched. Do not touch it in any way. He doesn't want it altered in any way.
>
> Q.    And what was your reason for asking to do that?
>
> A.    Because it was not in a manner that I would -- that I would get a -- I would be able to examine it flat. It was folded over, and I wouldn't be able to get a full picture.
>
> Q.    Did you think you would have been able to do that if you were given the opportunity to do so?
>
> A.    Yes.
>
> Q.    And did you have the equipment there to do that?
>
> A.    Yes.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 108:17-109:14; *see also* Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 201:12-25 (Jean testifying that she offered to uncrumple the tape "[t]o get a better picture" by applying a chemical that "separates the adhesive sides of tape from each other," but "Mr. Stern did not want the tape touched in any way.").

### 5. Petitioner's Admissions

Respondent's post-hearing memorandum makes reference to out-of-court statements petitioner made prior to his state trial. He claimed that someone forced him to tape the victim's ankles. These statements by petitioner were as follows:

- Petitioner's January 9, 2005 videotaped statement to former Assistant District Attorney Elisa Paisner: Hamilton stated that a third party named Tony forced him to duct tape the victim and that he did tape her foot. *See* Resp't's Ex. 12A (Transcript of R. Hamilton Videotaped Statement to ADA Paisner), at 37.

- Petitioner's January 9, 2005 written statement to the police: Hamilton wrote that "I can't believe what happen it all seems like any other Sunday next I know I be taping my son[']s mother foot up and watching her die in front of me." *See* Resp't's Ex. 17 (R. Hamilton's Handwritten Statement to NYPD), at 3.

- Petitioner's January 9, 2005 oral statement to the police: The notes taken by the NYPD detective report Hamilton as saying that "[Tony] brought tape and made me tie her feet." Resp't's Ex. 18 (Det. Hernandez Handwritten Notes of R. Hamilton's Oral Statement), at 2.

*See also* Resp't's Post-Hr'g Mem. at 14-16.

Petitioner challenged the introduction of these statements in the context of the instant Rule 60(b) motion, arguing that they were deemed inadmissible by the trial court. *See* Pet'r's Letter of Mar. 30, 2016, ECF No. 154. The relevant trial court transcript, however, indicates otherwise:

> The Court finds that the People have met their burden of demonstrating, beyond a reasonable doubt, that Defendant's video taped statement, and other statements were voluntary. And that he willingly, and knowingly, and intelligently waived his constitutional rights as articulated under Miranda v. Arizona 384 U.S., 436. People versus Huntley 15 NY2d 72. And, People versus Anderson, already cited at 42 NY2d 35.

> Accordingly, Defendant's motion to suppress all of the statements [is] denied, in all respects.

Dunaway/Huntley Hr'g Tr., July 11, 2006, ECF No. 9-11, at 57:8-17.

These statements were nonetheless never introduced during Hamilton's state trial. *See* Sandoval Hr'g Tr., Dec. 5, 2006, ECF No. 9-11, at 15:2-11 (ADA Purce stating that he did not plan to use the statements at trial); *see also* Hr'g Tr., Apr. 8, 2016, at 207:6-11 (ADA Bruffee testifying that ADA Purce "made a trial judgment not to offer [the videotaped statement] into evidence, but it was in the case and there is a ruling that it was voluntary and knowing and it's a party admission.").

Respondent's suggestion that petitioner's statements be used now is rejected. They introduce a confusing issue which has no bearing on whether petitioner had a fair trial, the central concern of the instant motion. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 181-182 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); *Graves*, 811 F. Supp. 2d at 607; Hr'g Tr., Apr. 8, 2016, ECF No. 171, at 211:5-11 (court stating that evidence of petitioner's videotaped statement was of "no significance" and "irrelevant" to the present proceedings); *see also* Hr'g Tr., Mar. 20, 2015, ECF No. 75, at 20:8-16 (court stating that it could not use a statement not admitted at trial in determining whether or not to grant the *habeas* petition).

### D. Ineffective Assistance of Counsel

#### 1. Claim Already Considered and Dismissed

Petitioner's ineffective assistance of counsel claim was raised in his original *habeas* petition and dismissed as without merit. Petitioner argued that his trial counsel was ineffective by, among other things, failing to challenge—either through independent expert analysis or effective cross-examination—the developed latent print as well as the images used in the print comparison:

> [Trial counsel] failed to obtain experts for the defense to analyze the photographs used in the palmprint comparison, the computer system which generated those photographs, the method used to produce the

latent from the duct tape, the origin of the duct tape, and the ultimate palmprint comparison itself. The failures of foundation for the prosecution prints evidence and the instances of falsity in the presentation of that evidence were reason enough then, and are now, for such examinations to take place.

Reasonably competent representation required such examination, and the inaction of counsel fell below the standard. Given the factors of petitioner's assertion of actual innocen[c]e and the lack of foundation for the forensic evidence falsely presented to the jury as conclusive, no so-called strategic rationale was sufficient for avoiding expert analysis on behalf of the defense, and none was presented to the jury by defense counsel either in cross-examination or summation.

Pet'r's Suppl. Mem. at 15-16 (internal citations omitted).

This court determined that trial counsel was not ineffective. He adequately challenged the prosecution's print expert through cross-examination:

To demonstrate that an attorney was ineffective because he failed to explore a particular issue or present certain evidence, a petitioner must demonstrate the absence of strategic or other legitimate explanations for defense counsel's failure. Petitioner argues that "no so-called strategic rationale was sufficient for avoiding expert analysis on behalf of the defense" to refute Jean's and Kennedy's fingerprint testimony. However, "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." Here, trial counsel adequately challenged the prosecution's fingerprint expert on cross-examination and in his summation—he challenged Kennedy's lack of experience and asserted that she had a motive to assist in obtaining petitioner's conviction.

*Hamilton*, 94 F. Supp. 3d at 479 (internal citations omitted).

### 2.     New Evidence Confirms Original Findings

In his post-hearing memorandum, petitioner raises essentially the same ineffective assistance of counsel allegations that were addressed in his original *habeas* petition. *See* Pet'r's Post-Hr'g Mem. at 16-17. According to petitioner, his trial counsel was ineffective because he "failed to obtain experts for the defense to analyze the duct tape and the photographs used in the .

. . palmprint comparison, the computer system which generated those photographs, and the method used to produce the latent on the duct tape." *Id*. He argues that these "failures of foundation . . . establish reason to doubt the palmprint . . . ." *Id*. at 17. The prejudice prong of *Strickland* is satisfied, petitioner claims, because had "trial counsel obtained expert examination of the tape, at, or prior to, the trial in 2006, this exculpatory evidence of the absence of a latent on the tape and the failures of the prosecution to satisfactorily preserve and corroborate its existence could have been presented to the jury." *Id*. at 17-18.

The newly available evidence and hearing record confirm the court's original findings. The strategic decision by petitioner's counsel to challenge the print evidence through cross-examination rather than expert analysis was reasonable. No prejudice is established. *First*, the newly available evidence is not exculpatory. Although re-examination of the tape in January 2016 did not reveal a print that was "usable" for comparison purposes, it showed the existence of ridge detail in the same location where a print was first identified ten years earlier. *Second*, extensive hearing testimony established that Jean properly preserved the latent print she developed in 2005 by capturing a digital image of it and storing it on the "More Hits" database, in accordance with applicable and sound NYPD practice. No "phantom photograph" exists that was not shared with petitioner. A print-out of the latent print image digitally stored on the "More Hits" program was introduced at trial. It matched petitioner's inked print exemplar, as acknowledged by petitioner's own print expert.

### E. Adequacy of Rule 60(b) Hearing

In his post-hearing memorandum, petitioner argues that the evidentiary hearing in the instant Rule 60(b) motion was "unreasonably truncated due to limitations imposed by the Court." Pet'r's Post-Hr'g Mem. at 20. This claim is without merit.

Evidentiary hearings are generally disfavored in *habeas* proceedings. One was allowed here due to the unusual circumstances of the case. The scope of the hearing was properly limited to the serious allegations of fraud raised by petitioner, based on evidence that was previously not available. It was not meant to be a new trial—of either his *habeas* petition or his state court proceedings. *See, e.g.*, Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 94:4-8 ("I am not retrying this case. This is not a trial. This is a hearing to determine whether this defendant, petitioner, movant had his rights constitutionally denied by a fraud. That's all I want to know.") (court's statement).

Petitioner was allowed to thoroughly explore his claims through the instant Rule 60(b) motion, once the duct tape evidence became available. The tape was twice re-examined. Ample discovery was granted. *See, e.g.*, Order of Dec. 16, 2015, ECF No. 113 (sealed) (granting subpoenas for NYPD Laboratory 2005 Standard Operating Procedures and for all fingerprint records of petitioner); Order of Mar. 10, 2016 (noting that respondent was to confirm production of Jean's entire fingerprint file as well as produce "either the original hard copy photograph of the latent print or an affidavit of Jean explaining why it is not being produced (which may include an explanation of whether a hard copy ever existed at all)"). A two-day extensive evidentiary hearing was conducted. Petitioner had the opportunity to comprehensively cross-examine the NYPD criminalist who developed the latent print in 2005 and to put forward his own experts. *See generally* Hr'g Tr., Apr. 7, 2016, ECF No. 162; Hr'g Tr., Apr. 8, 2016, ECF No. 171.

All evidence was considered and reasonable findings as to admissibility, probative force, and credibility were made by the court.

## VI.    Conclusion

No indication of any fabrication or other fraud was presented raising any doubt as to the validity of the palm print evidence submitted at trial.  Petitioner's own experts could not point to any signs of falsification.  Garrett testified:

> COURT:  Is there anything in the record that you examined that led you to believe that there had been a falsification of the documents shown to the jury which you saw today?
>
> WITNESS:  No, sir.

Hr'g Tr., Apr. 7, 2016, ECF No. 162, at 87:1-5.  Similarly, McEvoy testified:

> COURT:  Is there a substantial probability based on this examination by you that there was a fraud in creating false information about these fingerprints?
>
> WITNESS:  (Pausing.) I don't see signs of fraud.

*Id.* at 93:21-24.

The hearing record confirmed that the NYPD followed appropriate procedures in the development and preservation of the palm print evidence.  The record does not support a finding that petitioner's counsel was ineffective or that there was any sign of fraud in the presentation of the evidence to the jury.

Petitioner's Rule 60(b) motion seeking relief from this court's March 27, 2015 judgment denying his writ of *habeas corpus* is denied.


SO ORDERED.


/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Date:  May 26, 2016
        Brooklyn, New York